PENNSYLVANIA RAILROAD COMPANY *v.* HEMMER, ADMINISTRATRIX.

[No. 25,614. Filed June 27, 1933. Rehearing denied March 8, 1934.]

312

*John Rynerson, Anderson, Mayfield & Rynerson, Loyd C. Byer, Donald P. Shinn, Edward P. Elsner,* and *Wendell Rynerson,* for appellant.

*Montgomery & Montgomery,* for appellee.

TREANOR, J.—This action was brought by the plaintiff as administratrix of the estate of Charles A. Hem-

mer, deceased, against the defendant, The Pennsylvania Railroad Company, to recover damages for the alleged wrongful death of Charles A. Hemmer.

The complaint alleged, in substance, that the defendant maintained and used a side track parallel with and a few feet east of the main line of defendant's railroad which ran along Indianapolis Avenue and crossed Tipton Street in the City of Seymour; that by an ordinance of the City of Seymour it was made unlawful to operate any locomotive, car or cars within said city at a speed in excess of eight miles per hour; that on the day named plaintiff's deceased was on "Tipton street east of defendant's tracks, on foot and desiring to travel westward over said crossing, but the same was obstructed by a long freight train moving northward on the main track, and he walked to a point in said street near said moving train and about the middle of defendant's side track and while waiting at said point for said freight train to pass and clear said crossing, defendant carelessly and negligently ran a locomotive northward upon and along said side track and against, upon and over said Charles A. Hemmer and thereby so injured him and that he then and there died of such injuries." The defendant's negligence was specifically alleged to consist of (a) running the locomotive at a speed greater than 8 miles per hour, to wit: 12 miles per hour; (b) running the locomotive over the Tipton Street crossing without having sounded the whistle as it approached the crossing; (c) failure to ring the bell on the locomotive; (d) failure of the engineer on the locomotive to keep a look out for persons and vehicles using and intending to use the crossing and not seeing plaintiff's decedent before striking him; and (e) running the locomotive along the side track when it "could not be heard because of the noise from said freight train or so

closely following said freight train as needlessly to endanger life and property on said crossing."

The trial court overruled appellant's motion to make the complaint more specific and appellant's demurrer to the complaint, and issue was joined by appellant's answer in general denial. Trial by jury resulted in a verdict for appellee. Appellant's motion for new trial was overruled and judgment was rendered upon the verdict. Appellant assigns as error the overruling of its motion to make more specific, its demurrer, and its motion for a new trial.

We think the trial court committed no error in overruling appellant's motion to make more specific. We agree with appellant's proposition that "the defendant was entitled to have the complaint state the specific acts or omissions of the defendant which constitute the negligence relied upon," but we think the complaint sufficiently alleged specific acts and omissions on the part of the defendant which constituted negligence.

"It has often been held by this Court that a general charge of negligence is sufficient as against a demurrer, but if a defendant desires a more specific charge he is entitled to it upon motion, if made in due season. But the rule has its limitations. A plaintiff is required to charge his cause of action in direct and certain terms yet he is not required to go into an elaboration of details beyond what is reasonably necessary fully and distinctly to inform the defendant of what he is called upon to meet." *Pittsburgh, etc., Ry. Co.* v. *Simons* (1907), 168 Ind. 333, 79 N. E. 911.

"Appellant was entitled to have 'a statement of the facts constituting the cause of action, in plain and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended.' §343 Burns 1914. . . . But this rule does not require more than is reasonably necessary to fully and distinctly inform the defendant of what he is called

upon to meet." *Haskell and Barker Car Co.* v. *Trzop* (1920), 190 Ind. 35, 128 N. E. 401.

In support of its contention that the trial court erred in overruling appellant's demurrer to the complaint appellant says that "it affirmatively appears from the averments of the complaint that decedent was guilty of contributory negligence which was the proximate cause of his injury and death." No such affirmative showing appears in the complaint. The complaint alleges that the decedent walked to a point in the street near said moving train and about the middle of defendant's side track and that while waiting there for the freight train to pass and clear the crossing the defendant carelessly and negligently ran a locomotive on said track and against the decedent, and the facts are alleged concerning the operation of the locomotive which would constitute such carelessness and negligence. It can not be said, as a matter of law, that the act of decedent in waiting at the crossing, in the middle of defendant's side track, for the freight train to pass, as alleged, considered in connection with the allegedly negligent operation of defendant's locomotive upon the side track, constituted contributory negligence which was the proximate cause of the injury and death. *Cleveland, etc., Ry. Co.* v. *Miles* (1904), 162 Ind. 646, 651, 70 N. E. 985; *Chicago, etc., R. Co.* v. *Boggs,* (1885), 101 Ind. 522. No error was committed in overruling appellant's demurrer.

Under its third assignment of error, the overruling of the motion for new trial, appellant presents in Points and Authorities the court's action in giving instructions 1, 4, 5, 6, 8, and 10 at appellee's request, the refusal to give instruction No. 20 tendered by appellant, the exclusion of appellant's exhibit No. 1 from evidence, and that the verdict is not sustained by sufficient evidence and is contrary to law.

Appellee contends that no question as to instructions is presented on appeal because the trial court gave three instructions of its own motion which instructions were not signed by the judge; because the trial court did not "indicate before instructing the jury, by a memorandum in writing, at the close of the instructions" requested by appellee "the numbers of those (to be) given and of those (to be) refused," as is provided in §586, Burns Ann. Ind. St. 1926 (Acts 1903, p. 338, §2-2010, Burns 1933, §343, Baldwin's 1934) ; and further because the instructions are not in the record in that they "are not incorporated in or set out in the order purporting to make them a part of the record."

An examination of the record shows a complete absence of a written memorandum at the close of appellee's requested instructions indicating the numbers of the instructions to be given or to be refused. Nor is there a written memorandum, signed by the judge, on the margin or at the close of each of appellee's instructions indicating whether the several instructions were refused or given. Further, the record does not show that the instructions given by the court on its own motion were signed. Also, as pointed out by appellee, "the instructions are not incorporated in or set out in the order purporting to make them a part of the record;" which is the approved method of making the instructions a part of the record. An appellant may bring up instructions by a special bill of exceptions or as a part of the record which "may be included in the transcript on appeal." If he chooses to bring them up as a part of the record they must be made a part of the record; and this can be done only by substantial compliance with the provisions of the statute. In *Morgan Construction Co.* v. *Dulin* (1915), 184 Ind. 652, 109 N. E. 960, there was no written memorandum indorsed upon the instructions of appellee and

this court held that the instructions were not in the record. The pertinent statements of the opinion in that case are as follows:

"It further appears, however, that certain other instructions were tendered by appellee with a request that each of them be given to the jury and with a further request that the court indicate by a memorandum in writing which of such instructions would be given and which would be refused. From the original record in this cause it does not appear that a memorandum of any kind was endorsed by the trial judge on the instructions so tendered by appellee and there is nothing in the record to suggest that he did in fact comply with the requirement of the statute in that regard. As we have already determined the presence in the record of a memorandum which is in other respects sufficient will give rise to the presumption that it was prepared at the proper time and such presumption will prevail unless affirmatively rebutted. It is equally true that from the absence of such a memorandum it must be assumed that none was prepared, and its absence cannot be supplied by record entry or other endorsement which does not meet the requirements of the statute. In the case at bar, however, appellant has sought to bring into the record by writ of *certiorari* a memorandum signed by the trial judge showing that each of the instructions tendered by appellee was given to the jury. But the return to the writ also shows affirmatively that such memorandum was in fact prepared and signed after the jury had been instructed. This is not a compliance with the provisions of the statute and precludes our consideration of the instructions. As the instructions tendered by appellee are not properly in the record no question is presented as to any of the instructions given or refused." *Morgan Constr. Co.* v. *Dulin, supra,* p. 656.

In the transcript of the record of the instant case there is a record entry which recites that certain numbered instructions tendered by appellee were given or refused but under the holding of *Morgan Constr. Co.* v. *Dulin, supra,* that is not sufficient. On the authority of

that case we hold that appellee's instructions are not in the record; and consequently we can not consider any questions based upon alleged errors in giving or refusing to give instructions.

Appellant insists that the trial court erred in excluding from evidence its Exhibit No. 1 which was an ordinance of the City of Seymour fixing the width of the street at and east of the defendant's right of way where the accident occurred at fifty feet. It appears that the ordinance was passed by the Common Council of the City of Seymour in 1885. Appellee objected to the introduction of the exhibit on the grounds that a street can not be "laid out and established as to width, extended or narrowed by an ordinance" and an ordinance can not "contradict the dedication of a plat," and when a street is laid out there must be a plat and a record made and kept in a book for that purpose." Appellee cites §§3106, 3166, and 3192, R. S. 1881, as authority for the proposition that at the time the offered ordinance was enacted the common council of a city had no authority to establish by ordinance the width of any street; from which it would follow that the ordinance was invalid and its admission in evidence properly refused. By §3106, *supra*, (Acts 1873, p. 50, amending §53, ch. XV, Acts 1867) the powers of the common council of cities are set out, but the power to enact ordinances concerning the establishment, widening, or narrowing of streets is not included therein. By chapter V, Acts 1875, p. 17 (§3166 et seq. R. S. 1881) provision was made for the appointment of city commissioners whose duty it was "to hear and determine all matters appertaining to the acquisition, opening, laying out, altering and straightening of streets, alleys and highways within said city." It was there provided that said commissioners should file in the office of city clerk their report showing the character of any change or

improvement, and if the city council should "by a vote of two-thirds of the members therof, determine to make the appropriation of the real estate for such improvement they shall enact a resolution accepting said report." It was further made the duty of the city clerk to "copy the entire report into the records of the common council and to carefully file and preserve the original." (§3175, R. S. 1881). .

If, at the time of the enactment of the ordinance offered in evidence, proceedings to establish the street here involved required the appropriation of real estate it would have been necessary that the report of the commissioners be accepted by resolution of the common council, and in any event it was required that the entire report be copied into the records of the common council and that the original be filed and preserved. Section 27 of the 1875 act (§3192, R. S. 1881) provided that "whenever any street . . . shall have been opened . . . a proper plat thereof shall be filed in the Recorder's office of the county in which such city is situated," such plat to be made by the City Engineer and filed by the City Clerk.

In its argument appellant contends that the ordinance was "some evidence of the width of the street as established by the authorities" and that "how effective it was for that purpose and what weight it might have as evidence was a question for the jury and the power and authority of the municipality of Seymour to establish and define a street in that way was a proper question for instructions by the court." Assuming that the ordinance was admissible as evidence, appellant is correct in its contention that "what weight it might have as evidence was a question for the jury," but the admissibility of the ordinance as evidence presented a question for the trial judge and it would have been improper to have left for the jury the question of the "power and

authority of the municipality of Seymour to establish and define a street" by the ordinance offered by appellant.

"The admissibility of a given piece of evidence is for the judge to determine. This general principle is not disputed; its application to the various kinds of evidence—qualifications of witnesses, absence of a hearsay deponent, voluntariness of a confession, condition of a dying declarant, and so on—has already been considered under the various heads of evidence. It follows that, so far as the admissibility in law depends on some incidental question of fact—the absence of a deponent from the jurisdiction, the use of threats to obtain a confession, the sanity of a witness, and the like—this also is for the judge to determine, before he admits the evidence to the jury.

"This principle, one of the foundation stones of our law, has countless applications under the various rules of admissibility. In more recent times, however, a heterodox practice has appeared, in places, of leaving some questions of admissibility to the jury. No doubt the judge, after admitting evidence, leaves to the jury to give it what weight they think fit, for they are the triers of the credibility and persuasive sufficiency of all evidence which is admitted for their consideration (post, §2551). But to hand the evidence to them, to be rejected or accepted according to some legal definition, and not according to its intrinsic value to their minds, is to commit a grave blunder. It is an error of policy (as well as a deviation from orthodox principle) for several reasons; in the first place, it is a needless abdication of the judicial function—of which humility we have already too much; furthermore, it adds another to the exceptions to the general rules; and finally, it cumbers the jury with legal definitions and offers an additional opportunity for quibbling over the tenor of the instructions." Wigmore on Evidence, 2d Ed. Vol. V, §2550, p. 555, 556.

Since, at the time of the adoption of the ordinance offered by appellant as evidence, the common council

possessed no authority to establish a street by ordinance, an ordinance purporting to so establish the street was invalid and therefore was properly excluded by the trial court.

Appellant also relies upon the insufficiency of the evidence to sustain the verdict. There was evidence from which the jury could have concluded that the ██ engine was running at an unlawful speed, and also that no warning was given either by blowing the whistle or by ringing the bell. Appellant contends that by reason of a city ordinance its engineer was under no duty to blow a warning whistle for Tipton Street. The state law requires the whistle to be blown three times when a locomotive engine is not less than eighty nor more than one hundred rods from a public highway crossing over which such engine is about to pass and the bell to be rung continuously, from the sounding of such whistle until the engine has passed over the crossing. The statute contains the following proviso:

"That nothing herein shall be construed as to interfere with any ordinance that has been or may hereafter be passed by any city or incorporated town in this State regulating the management or running of such engines or railroads within the limits of such city or incorporated town." §13038, Burns Ann. Ind. St. 1926, Acts 1881, p. 590.

The city ordinance in question is as follows:

"Sec. 3. It shall be unlawful for any person to sound any steam whistle on any locomotive engine, within the corporate limits of said city, except in cases when required by the State law of Indiana, and in cases of extreme danger or for purposes of sounding the alarm of fire. Any person violating the provisions of this section shall on conviction be fined in any sum not less than one dollar and not more than twenty-five dollars."

It is clear that the city of Seymour had the power to prohibit the blowing of engine whistles within the corporate limits of Seymour. But section 3, *supra,* expressly excepts from its general prohibition the provision of the State law which requires the locomotive engine whistle to be blown three times at a distance of not less than 80 nor more than 100 rods from a public crossing. In addition there is the express requirement that the whistle be blown in cases of extreme danger. The state law and city ordinance are not in conflict but harmonize and, when construed together, placed upon the appellant the duty of sounding the locomotive whistle at a distance of not less than 80 rods before reaching Tipton Street and also the duty of sounding it immediately before entering upon the Tipton Street crossing if the circumstances attending the presence of the deceased upon appellant's track presented a situation of extreme danger. We can not say that there was not sufficient evidence to justify the jury's believing that appellant was negligent; neither can we say that appellee's deceased was chargeable with contributory negligence as a matter of law. There were serious conflicts of evidence and it was a close question as to whether the deceased was exercising due care at the time of the accident. But the jury resolved these conflicts and questions of credibility of evidence against appellant's contentions and the trial court confirmed the jury's conclusion. We see no reason to disturb the result in the trial court.

Since we find no reversible error the judgment of the Jackson Circuit Court is affirmed.

### ON PETITION FOR REHEARING.

TREANOR, J.—Since oral argument was heard on the petition for a rehearing we shall discuss at some length the points which were specially stressed in the oral

argument and which appellant feels were not adequately treated in the original opinion.

Appellant assumes that certain allegations of specific acts of negligence amounted to averments of conclusions of fact. But in our opinion they are not conclusions but are the particular ultimate facts which support the general averment that the "defendant carelessly and negligently ran a locomotive northward upon and along said side track," which general averment is obviously a conclusion. As stated in our original opinion, "the complaint sufficiently alleged the specific acts and omissions on the part of defendant which constituted negligence." The matter which appellant urges ought to be in the complaint would require allegations of evidentiary facts or of facts which would tend to negative contributory negligence. Good pleading required plaintiff below to omit allegations of evidentiary facts; and negativing contributory negligence was no part of plaintiff's cause of action. Appellant urges, on the strength of *Terre Haute, etc., Traction Co.* v. *Scott* (1926), 197 Ind. 587, 150 N. E. 777, that we should have ignored such an allegation (i. e. that defendant ran its engine so closely following a freight train as needlessly to endanger life and property on such crossing) after a motion to make more specific had been overruled." The case relied on holds that where a motion to make more specific has been overruled "no facts not alleged therein will be implied by reason of the allegations of conclusions which were thus unsuccessfully challenged by said motion," i. e. as against a demurrer no facts will be implied to support "allegations of conclusions" of fact against which a motion to make more specific has been directed. In view of our holding that the allegations in question are not conclusions of fact, the reasoning of

appellant, based upon *Terre Haute, etc., Traction Co.* v. *Scott, supra,* has no application.

The allegations of the complaint make out a case of negligent injury and unless some of the facts alleged constitúte contributory negligence, as a matter of law, it was not error to overrule the demurrer to the complaint. Appellant insists that the complaint states that "the deceased was killed while standing waiting in the center of the track" and, consequently, that contributory negligence is shown as a matter of law. To appraise the legal effect of the statement it is necessary to consider other allegations, the more pertinent of which are the following:

"That on said date defendant's said railroad crossed another public highway and street in said City known as Tipton Street; and that at the crossing of said last named street and for a long distance therefrom both North and South of said point defendant then maintained and used a side track parallel with and a few feet east of its main track; and that on said date and for two years prior thereto, said street intersection and crossing over defendant's tracks, was and had been daily in constant use by great numbers of people, both on foot and in vehicles, which fact defendant then and there well knew, and by reason thereof defendant was required to use care to avoid injuring persons and property, in running its locomotives, cars and trains over said Tipton Street crossing.

. * * * *

"That on said date, plaintiff's decedent, Charles A. Hemmer, was on said Tipton Street east of defendant's said tracks, on foot, and desiring to travel westward over said crossing, but the same was obstructed by a long freight train moving northward on the main track, and he walked to a point in said street near said moving train and about the middle of defendant's said side track, and while waiting at said point for said freight train to pass and clear said crossing, defendant carelessly and negligently ran a locomotive northward upon and along said side track and against upon and over said Charles

A. Hemmer, and thereby so injured him that he then and there died of such injuries."

In determining whether a complaint discloses contributory negligence we must accept the statutory rule that contributory negligence is a defense.

"The burden of proof as to contributory negligence in an action for personal injuries is on the defendant. §380 Burns 1926, Acts 1899, p. 58, §1. And cases decided prior to 1899, when the statute cited took effect, which cases declared the common-law rule that if a person was injured at a railroad crossing, the fault was prima facie his own, are no longer authority on that question." *General, etc., Car Corp.* v. *Melville* (1926), 198 Ind. 529, 145 N. E. 890.

Under the facts alleged in this complaint it is not negligence, as a matter of law, for a pedestrian who is crossing a public thoroughfare, and who must cross two or more railroad tracks to walk to and upon a side track and to wait thereon until a moving train on the main track passes and clears the crossing. It was not incumbent upon the plaintiff to allege any facts to explain why the deceased failed to step off the side track in time to avoid being struck by appellant's locomotive. In *Southern Indiana Ry. Co.* v. *Peyton* (1902), 157 Ind. 690, 61 N. E. 722, plaintiff's deceased was killed in a collision between two trains at the intersection of two railroads. The point was made that the complaint contained no averment that the engineer, plaintiff's deceased, when approaching the intersection of the two railroads, where the injury was received, stopped his train and looked and listened before attempting to cross. This Court said that "no adverse inference will arise upon a pleading from the absence of unnecessary averments;" that it was not necessary for the plaintiff to allege and prove the decedent's freedom from contributory negligence; that "if he did not

stop, his transgression, if accounted contributory negligence, was a matter of defense that should be established by evidence, not by presumptions." So in the instant case, whether appellee's deceased was chargeable with contributory negligence by reason of his "waiting at said point for said freight train to pass and clear said crossing" was a question of fact to be established by evidence and as an affirmative defense. The trial court did not err in overruling the demurrer to the complaint.

Appellant urges that our conclusion that the instructions are not in the record was based upon the requirements of §586, Burns Ann. Ind. St. 1926, Acts 1903, ch. 193, p. 338, as amended, Acts 1907, ch. 283, p. 652 (§2-2010, Burns 1933, §343, Baldwin's 1934), and that we overlooked his contention that the instructions are in by force of an order of court under §717, Burns, etc., 1926, Acts 1881, ch. 38, p. 240, §638, (§2-3223, Burns 1933, §497, Baldwin's 1934).

In the original opinion we cited and quoted from *Morgan Const. Co.* v. *Dulin* (1916), 184 Ind. 652, 109 N. E. 960, as authority for the conclusion that the instructions were not in the record under §586, *supra*. We did not intend to leave the impression that compliance with §586 in respect to the written memorandum is necessary when instructions are brought into the record by including them in a formal order of the court. Perhaps we should have added "under §586" to our statement that on the authority of *Morgan Const. Co.* v. *Dulin* "the appellee's instructions are not in the record." (ante 311, 186 N. E. 288.) We think, however, that our statement in the original opinion is not misleading in view of the reference in the preceding paragraph to the fact that appellee was relying in part upon the absence of the memorandum in writing at the close of the instructions as is provided in §586, *supra*.

Instructions with exceptions thereto may be made a part of the trial court record by complying either with §§584 and 585, Burns, etc., 1926, §§2-2008, 2-2009, Burns Ind. Stat. Ann. 1933, §§341, 344, Baldwin's Ind. Ann. Stat. 1934, Acts 1881, sp. session, ch. 38, p. 240, §§376, 378, or with §586, *supra*. These statutory methods provide effective and dependable means of identification and authentication of instructions as well as methods of taking and preserving exceptions. No formal order by the court is required to make the instructions a part of the trial court record if either of the foregoing methods is followed. If §584, *supra,* is followed "all instructions given by the court (on its own motion) must be signed by the judge, and filed together with those asked for by the parties, as a part of the record. But the instructions shall not be entered at large on the final record unless either party may wish to remove the cause to a superior court." (§584, Burns, etc., *supra,* §376, Acts 1881, etc., *supra*). If §586 is followed then all instructions "shall be a part of the record without any bill of exceptions and, as such, may be included in the transcript on appeal." (§586, Burns, etc., *supra*). But §717 does not provide any means for identifying or authenticating instructions or for taking and saving exceptions but, as construed by this court, merely authorizes a trial court to make instructions a part of the trial court record by order of court. Consequently this court has held that the order must be drawn in such a way as to identify and authenticate the instructions. The holdings of this court in respect thereto have been accurately summarized as follows:

> "To be sufficient, the order must designate with reasonable certainty the particular extrinsic matters which it seeks to make a part of the record and such matters must be set out in full in the order. Instructions in a civil cause may be made a part of the record by an order which states that they 'are

in the words and figures following,' and recites them in full, together with the exceptions reserved. There is no reason to believe that the legislature intended that an order of court should be any less certain as to what was included in the record than a bill of exceptions, or that it should provide any less cumbersome means of incorporating matter into the record, farther than that the papers and documents indicated might be written out at once by the clerk under direction of the court, and thus the trouble of writing a bill of exceptions and securing the judge's approval and signature thereto might be saved. Ewbank's Manual of Practice (2nd Ed.) §27.

At the time that the original opinion was written we did not understand that appellant was insisting that the instructions and matters related thereto were physically and grammatically included in the order. We assumed that appellant was relying upon incorporation by reference to the preceding order book entries which had been copied into the transcript. Appellant insists, however, that "the order purporting to make them (the instructions) a part of the record" begins "in line 1, page 22 of the record, and ends with the signature of the judge in line 22, page 40 of the record." This portion of the record embraces all the proceedings of the fifteenth judicial day of the Jackson Circuit Court relating to the instant cause and there is no suggestion that the instructions recited therein are to be made a part of the record by order of the court until line 7 on page 39 is reached. Beginning with line 7 on page 39 we find the following:

"It is further ordered by the court that said instructions . . . be filed by the clerk as papers in said cause . . . and that said instructions . . . together with the exceptions taken by the defendant, be and are hereby made a part of the record of said cause."

It is obvious from the foregoing that the instructions are not "incorporated in or set out in the order pur-

porting to make them a part of the record," unless we can say that they are incorporated therein by reference or designation; for we must recognize that the order begins physically and grammatically at line 7 on page 39. When a party relies upon an order of the court to bring instructions into the record, under §717, Burns, etc., 1926, *supra,* the instructions must be incorporated in the body of the order. We quote the following from an opinion of this court:

> "To make matters outside of the record a part thereof by order instead of bill of exceptions, in the very nature of the transaction, the added matter must be spread upon, or written into the record. That can only be done by setting such matter forth in the order. Otherwise, this court could never tell what extrinsic matter had been added to or incorporated in the record. . . . The judge alone who makes the order is clothed with the power to decide what specific and particular extrinsic matter shall go in under the order. But if that thing is not set forth in the order, then the right of the judge to determine what extrinsic matter shall go in under such order is taken away, and such judical function is left to be performed by the clerk. That cannot be done in any case. This is so, because if the order merely designates the extrinsic matter, without setting it forth in the order, the clerk alone is left to say what shall go in under the order, even though such foreign matter may appear elsewhere in the transcript. . . . But here it appears that the extrinsic matter is referred to in the order, designating the pages of the transcript where such extrinsic matters have been copied into the transcript. Those matters confessedly not being a part of the record, a mere reference to them has no greater effect than if they had been copied into some other document, book, or paper, and referred to, even if such a reference would make them a part of the order, if they were legitimately a part of the record at the places in the transcript where they are copied. . . .
>
> "It would be most unreasonable to suppose that the legislature intended in providing two methods of incorporating extrinsic matter into the record,

that one should be any less certain than the other as to what is a legitimate part of the record after it is done. It is inconceivable that the legislature intended to leave attorneys free to choose between a loose, slip-shod, and an orderly, certain, and effectual way of making such matters a part of the record." *Close, by Next Friend* v. *Pittsburgh, etc., R. W. Co.* (1898), 150 Ind. 560, 50 N. E. 560.

Appellant refers us to *New York, etc., R. Co.* v. *First, etc., Savings Bank* (1926), 198 Ind. 376, 153 N. E. 761, as authority for holding the instructions in the instant case are in the record by order of court. In that case the instructions were included in the body of the order (see 198 Ind. 382) and the actual question was whether the record showed that the instructions had been filed. We quote the following from the opinion in that case:

"Instructions may be made part of the record by an 'order of court in which they are set out at length, together with the order making them such. §717 Burns 1926, §650 R. S. 1881; *Pennsylvania Co.* v. *Ebaugh* (1899), 152 Ind. 531, 533, 53 N. E. 763; *Indiana Union Traction Co.* v. *Sullivan* (1913), 53 Ind. App. 239, 101 N. E. 401; *Close* v. *Pittsburgh, etc., R. Co.* (1898), 150 Ind. 560, 564, 50 N. E. 560; Ewbank, Manual (2d Ed.) §§27, 36. And the transcript states that this was done in the case at bar, while there was no attempt to do it in *Indianapolis, etc., R. Co.,* v. *Ragan, supra.* The instructions given and those refused are duly shown to constitute part of the record, being made so by an order of court in which they are recited in full." *New York, etc., R. Co.* v. *First, etc., Savings Bank, supra.*

We see no reason to change our original conclusion that the evidence does not show as a matter of law that plaintiff's deceased was chargeable with contributory negligence. No interrogatories were submitted to the jury and consequently there are no ultimate findings of fact upon which to base a conclusion that appellee's deceased failed to exer-

cise due care. Further, we do not have the relatively simple facts of the ordinary case of a pedestrian starting to cross a single main track at a public crossing. The crossing in question contained three tracks, a main track, an ordinary commercial switch and a "siding," the main track lying between the switch on the west and the siding on the east, the tracks extending north and south. The deceased was killed by an engine which was running north on the siding. The engine had been cut off from its train of cars and had run on to the siding "two city blocks and a half" south of the point of the accident. Just prior to the accident a freight train had moved north over the crossing from the commercial switch onto the main track and had stopped with the rear car a few feet north of the crossing. The electric gong at the crossing was ringing and, according to one witness, had been ringing continuously for about fifteen minutes due to the switching back and forth of the freight train on the main track and on the west commercial switch.

There was testimony tending to show that Hemmer, while crossing the commercial switch and main track, walked northeast to speak to a brakeman; one of appellant's witnesses testifying that Hemmer told him "there was a car on some grain doors and he was going to tell the brakeman, to avoid a wreck." The brakeman belonged to the crew of the train which had just cleared the crossing and was standing at a switch stand a few feet north of the paved portion of the crossing and between the main track and the siding. The testimony of Witness Johnson indicates that Hemmer was speaking to the brakeman at the moment he was struck.[1] There was testimony tending to show that at approxi-

---

*Note 1.* "A. No, I did not, he was walking, had his hat in his hands, looking like he was calling to a man on the other train, calling his attention to something, that was what I thought when I laid eyes on him. Where he got on the track, I don't know."

mately the same point of time the freight train was clearing the crossing, Hemmer was starting over the crossing and the engine which struck Hemmer was coming up the main track from the south below the point where the siding leads off from the main track.

Appellant overlooks some very significant holdings and statements of this court in cases of injuries to travelers at railroad crossings. In *Stoy* v. *Louisville, etc., R. Co.* (1903), 160 Ind. 144, 66 N. E. 615, the deceased had been struck by the defendant's cars while he was passing over a "side track and switch" at a crossing. The plaintiff appealed "from a judgment for defendants on answers to interrogatories, notwithstanding the general verdict." The complaint alleged that "just as the said Raymond P. Stoy was passing over the said side-track and switch, the defendants, by their servants and agents in charge of said freight-train, negligently and wrongfully caused said freight-train to be suddenly and violently run backward against said detached cars so standing on said side-track and switch, without signal or warning of any kind, so that the said Raymond P. Stoy was, without fault on his part, and solely by reason of the carelessness and negligence of the defendants, struck by said standing car," etc. Interrogatory number 44 was as follows: "Did Raymond P. Stoy, from the time he left Well's store until he got on the siding, look east on said side-track in the direction of the freight-train and dead cars? Ans. No." We quote the following excerpts from the opinion in the foregoing case:

> "The look-and-listen rule can not be treated as an arbitrary standard of care to be inflexibly applied by the courts in all cases. Wood, Railroads, (2d Ed.) §323. As applied to ordinary grade crossings, the danger is so great that the courts declare the quantum of care required as a matter of law. This case, however, is not within the general rule."

"Our cases concerning injuries to travelers at ordinary railway crossings point out with no small degree of precision what care the traveler should exercise, but it is only necessary to note the reasons given in those cases to appreciate how inapplicable such reasons are to a case like the one at bar. The necessities of railroad traffic, the momentum of their trains, and the confinement of their movement to a track, entitles the company to a precedence in passing over a crossing; but the company should recognize that, apart from such necessary right of precedence, the traveler has as much right to use the crossing as it has, and this right upon the part of the traveler becomes much more than a mere theoretical right where it is proposed to start inert cars over a crossing. The right of precedence that the company is entitled to in the latter case can not arise until it has given due notice of its purpose to occupy the crossing. To back suddenly over the crossing without signal or warning of any kind would be an act of the clearest negligence. Shearman & Redfield, Negligence (5th Ed.), §471, and cases cited; Beach, Contrib. Neg. (2d Ed.), §194."

"To what extent is the above consideration a factor in determining whether the decedent was guilty of contributory fault? . . . It is enough to affirm in this case that there was so far an appearance of safety—whether there was an implied invitation to cross or not—that the situation as it appeared, to the extent that it seemed to denote safety, was proper to be considered as a component part of the whole transaction."

"It is true that at an ordinary grade crossing the traveler must first vigilantly exercise his senses before placing any reliance upon the supposition that the company will perform its duty (*Malott* v. *Hawkins,* 159 Ind. 127, and cases cited), but this holding is based upon the fact that the danger of a train dashing over the crossing is too great to justify a reliance upon such a supposition alone; but where inert and detached cars stand on either side of a crossing, we think that the traveler's conduct should be viewed in the light of the situation as it presented itself to him."

In the instant case the jury might have found that as Hemmer started over the crossing "the situation, as it

presented itself to him," was that the siding was clear, that a train was approaching from the south, on the main track. It was then a question of fact whether Hemmer, in the exercise of due care, could walk diagonally across the crossing and step upon the siding without looking to the south.

This court has disapproved a blind application of the look-and-listen rule even in ordinary crossing cases. The attitude of this court was accurately indicated in *Grand Trunk, etc., R. Co.* v. *Reynolds* (1910), 175 Ind. 161, 92 N. E. 733, 93 N. E. 850, and from which we quote the following with approval:

> "In the case of *Lake Shore etc., R. Co.* v. *Brown* (1908), 41 Ind. App. 435, 84 N. E. 25, it was held, affirming the statement from *Chicago, etc., R. Co.* v. *Hedges* (1889), 118 Ind. 5, 20 N. E. 530, that 'the law presumes that one having the ordinary sense of sight must have seen that which was within the range of his vision.' The statement is doubtless correct as applied to those cases, for in each of them there was a finding that the injured person was so situated that he could see the train in time to escape injury, with nothing to excuse his failure to look and see, and in such cases there is a presumption that he saw or heard what it is manifest that he could have seen or heard.
>
> "But the rule declared is not one that applies irrespective of the evidence or without evidence. To invoke it, there must be evidence of circumstances showing that a failure to see and hear was caused by a failure to use those senses under conditions where seeing or hearing, or both, were available to give notice in time to avoid injury. *Malott* v. *Hawkins, supra; Wabash R. Co.* v. *Keister* (1904), 163 Ind. 609, 67 N. E. 521; *Pittsburgh, etc., R. Co.* v. *Seivers* (1904), 162 Ind. 234, 67 N. E. 680, 70 N. E. 133; *Stewart* v. *Pennsylvania Co.* (1892), 130 Ind. 242, 29 N. E. 916; *Elliott* v. *Chicago, etc., R. Co.* (1893), 150 U. S. 245, 37 L. Ed. 1068, 14 Sup. Ct. 85; *Stoy* v. *Louisville, etc., R. Co.* (1903), 160 Ind. 144, 66 N. E. 615.
>
> "The jury found that decedent looked and listened as he approached the crossing. . . . But if that finding be disregarded we cannot assume, as

against the general verdict, that there was evidence that he could see or hear, or that looking or listening would have been available, or that he did not, under the facts and circumstances shown, use ordinary care."

In harmony with the foregoing is the following excerpt from *Cleveland, etc., R. Co.* v. *Lynn* (1912), 177 Ind. 311, 95 N. E. 577, 98 N. E. 67:

"It is next urged that as appellant has alleged in detail just what appellee did, there is a clear inference of contributory negligence, based on the theory that he was bound to see and hear what, by looking and listening he would have seen, or heard. But the difficulty with appellant's position on that point is, that that is asking us to assume that appellee was bound to look or listen at a particular place, in a particular direction, at almost a particular instant of time, irrespective of other relations or conditions. It might be a fair inference of fact, but there is in it just the difference between looking or listening, where the court can say that he must have seen or heard, and looking or listening under conditions where it is possible that he might not have seen or heard, with the added duty of appellant to have a bell ringing, and to move its cars not to exceed five miles an hour."

The testimony relative to Hemmer's exact location at the moment he was struck was conflicting. The only fact clearly established was that he was taking a step north between the rails of the siding. The ticket agent of the B. & O. railroad testified that about three minutes after he saw the body of Hemmer under the engine he "walked back to see where he had been first struck" and that "the point from where the body began to be dragged was five or six feet south of the switchstand, which point was four or five feet north of the north edge of the planked or gravel crossing where vehicles go." The engineer of the train which was on the main track testified as follows:

That he was looking south from a point about 220 feet north of the switchstand and first saw Hemmer "between the rails of the passing siding . . . nearer the east rail"; that Hemmer made "one step and the engine caught his left ankle and brought him over forward against his shoulder"; that he observed Hemmer looking south "just at that time when I (the witness) seen it (the engine) coming"; that "he was looking south at that time, when I seen him make this step, looking south; in that instant he was struck."

The engineer also testified that the point at which Hemmer was first seen by him was "five or ten feet, right in that locality," north of the point where Osborne, the brakeman, had appeared "between the rails of the passing siding" to signal the engineer to stop the north progress of the train. To locate Hemmer's position the engineer relied upon his "position" and his "familiarity," since at that moment the brakeman was not within his vision. In reconciling the testimony of the B. & O. agent who located the physical marks the point from which Hemmer's body was dragged and the testimony of the engineer relative to the situation at the moment that Hemmer was struck the jury reasonably could have concluded that Hemmer was at the north edge of the planked or graveled crossing "where vehicles go." According to the engineer's testimony Hemmer was struck at the instant that he was taking a step north between the rails of the siding and "the engine caught his left ankle and brought him over forward against his shoulder." It is evident that "the point at which the body began to be dragged" must have been several feet north of the point where "the engine caught his left ankle." Consequently the jury reasonably could have inferred that Hemmer walked across Tipton Street to the passing siding at or near the north edge of the "plank or gravel crossing"; and then took a step north between the rails of the siding to speak to the brake-

man; and, at this instant, was struck. It was not necessary under the evidence that the jury conclude that Hemmer walked north of the traveled portion of the crossing, either between the main track and the siding or between the rails of the siding, before he was struck.

No one saw Hemmer look or listen before he stepped upon the siding but there is no conclusive evidence that he did not look as he walked diagonally northeast over the crossing. One of appellant's witnesses testified that he did not see him look to the south! and another that "never noticed him look to the south"; and there was testimony to the effect that there was not "any obstruction to his (Hemmer's) view looking to the south, to prevent him seeing this approaching engine on the siding." It is clear that he could have seen the engine approaching on the side track if he had looked south just before he stepped upon it. But we cannot say that Hemmer was chargeable with contributory negligence, as a matter of law, because he did not look to the south immediately before he stepped upon the siding. In *Union Traction Co.* v. *Haworth* (1918), 187 Ind. 451, 463, 115 N. E. 753, 119 N. E. 869, this court, in approving the trial court's refusal to give a tendered instruction, spoke as follows:

> "By this instruction appellant sought to invoke the stop, look and listen rule as an arbitrary standard of care for the measurement of appellee's actions immediately prior to the casualty. This court has said that this rule cannot be inflexibly applied by the courts in all cases. *Stoy* v. *Louisville, etc. R. Co.* (1902), 160 Ind. 144, 66 N. E. 615. Nor can it be said, as a matter of law, 'that under all circumstances or conditions, looking or listening at a particular time, in a particular direction, or from a particular place is required.' *Cleveland, etc., R. Co.* v. *Lynn* (1911) 177 Ind. 311, 95 N. E. 577, 98 N. E. 67. . . . But we deem it sufficient to say that we adhere to what we regard as the correct rule, which requires the traveler to use ordinary care consist-

ent with the dangers incident to the crossing and its obstructions and hazards."

This court has frequently said that a traveler was chargeable with contributory negligence, as a matter of law, in cases where the jury, by answers to interrogatories, indicated that the traveler failed to look or listen at a time when a prudent person would have looked or listened and at a time when looking or listening would have revealed the danger in time for avoidance of injury. (See *Grand Trunk, etc., R. Co.* v. *Reynolds, supra.*) But in the case at bar there were no interrogatories, and, in the face of the general verdict for the plaintiff, we must assume that the jury found that Hemmer exercised due care. The duty of one about to cross a railroad at a public crossing is completely and aptly stated in an instruction, which was approved by this Court in *Cleveland, etc., Ry. Co.* v. *Lynn, supra,* which instruction is as follows:

"It cannot be said as a matter of law, that plaintiff, while approaching and attempting to cross defendant's tracks at Third Avenue, should have looked and listened for approaching locomotive engines and trains, at any particular point, or at any particular time, or that he should have looked in one direction at a particular time, and in another direction at another particular time. These are questions for you to determine. The law simply says that he should have looked and listened at such time, at such place, and in such directions as a person exercising ordinary prudence would have done under the circumstances surrounding the plaintiff at the time, as shown by the evidence in the case."

As indicated by the foregoing, ordinary care requires one who is about to go upon a railroad track to look and listen, but it does not follow that failure to look and listen at the precise time at which looking or listening would reveal the danger constitutes contributory negligence. It is possible that one in the exercise of due care may look and listen at a moment when no danger is

revealed by looking and listening, and yet fail to look or listen at the very moment when the danger could be discovered and the casualty avoided. On the other hand one might fail to look and listen at the moment when due care would require one to look and listen, and still this failure to look and listen would not contribute legally to the casualty if the danger could not have been discovered and avoided.[2] In short, the proper and precise inquiry is not whether the injured person could have discovered his peril and avoided his injury by looking and listening, but whether he could have discovered his peril and avoided his injury by looking and listening when a reasonably careful and prudent man would have looked and listened.

As indicated above, the engine which struck Hemmer had come up the main track and had run onto the siding south of Tipton Street. The testimony does not indicate the exact distance from the beginning of the siding to the north edge of Tipton Street. One witness testified that it was about two and one-half city blocks; but there was no evidence as to the length of the city blocks. The engineer of the engine which struck Hemmer testified that he saw the brakeman, Osborne, at the switchstand just as soon as his engine entered the siding. There was testimony from which the jury could have inferred that Hemmer was walking from west to east across the commercial switch and main track just before the brakeman reached the switchstand; and that if Hemmer looked south as he was starting over the

*Note 2.* There must be a causal relation between the plaintiff's failure to use due care and the casualty. "For the plaintiff's conduct to be a legal cause of the harm, it must appear, of course, that it was a cause in fact, that is, a *sine qua non,* and that there was no intervening force which superseded it so as to make the plaintiff's conduct relatively unimportant in the causal sequence. In other words, the principles which determine whether a defendant's conduct was a legal cause of the harm are identical with those which establish such relationship between the plaintiff's conduct and the harm complained of." Harper, Law of Torts, §134, and cases cited.

crossing, he would have seen the engine still on the main track and just before it entered the siding.

The jury reasonably might have inferred from Osborne's testimony that he saw the engine on the main track below Tipton Street and did not anticipate its coming upon the siding and was not conscious of its approach upon the siding until, as he testified, "I raised up and it was right on me." This inference would have been strengthened by the following recital in the transcript of the evidence:

(Cross-examination of the engineer, Monyhan, whose engine struck Hemmer.)

A. No, sir, I saw the man at the switch stand, knowed the man was going to stoop down to operate that switch, and his body sticks out beyond, and I knew we might strike him.

Q. You say you saw the man at the switch?

A. As soon as we entered the siding, I saw the brakeman.

Q. When you were entering?

A. Yes, . . ."

For in view of engineer Monyhan's immediate recognition of the danger of his engine's striking brakeman Osborne it was a reasonable inference from Osborne's indifference to the engine's approach that he was not conscious that it was on the siding until he "raised up and it was right on" him. The jury could have inferred that Osborne, the brakeman, was not conscious of the noise of the approaching engine until he "raised up." Such an inference would have been supported by the engineer's testimony that his engine "was coasting along" and by the fact that the crossing bell was ringing.

According to the testimony of Osborne's engineer, Osborne stood between the rails of the siding, facing north, and signaled to his engineer and then stepped a few feet to the switch stand and stooped over to throw the switch. At that moment he raised up and the engine was "right on him"; and at the same instant he

saw Hemmer. The fact, which the jury could have inferred, that Osborne, an experienced railroader, did not anticipate that the engine was coming up the siding and was not conscious of its proximity until "it was right on" him was entitled to some weight by the jury in determining whether Hemmer was negligent in going upon the siding without looking to the south.

We cannot say the jury was not justified in believing that Hemmer, as he started over the crossing, was conscious of the fact that the siding was clear and that a train was moving north toward him on the main track. Nor can we say that the jury did not believe, and reasonably so, that Hemmer was justified in assuming that the engine was coming up on the main track. He knew that the cause of the ringing of the crossing bell was the presence of the freight train which was moving north and clearing the crossing; and the sound of the bell did not in fact serve as a warning of the approach of the engine on the siding. No new factors entered into the situation during the short interval, within which Hemmer was walking across the commercial switch and the main track to the siding, which required the jury to find that he reasonably apprehended any danger from appellant's engine on the siding. The jury heard the testimony and viewed the premises and could visualize the whole situation much more accurately than we can. We appreciate, as stated in the original opinion, that the testimony presents serious conflicts and that it is a close question as to whether Hemmer was exercising due care at the time of the accident. But the jury resolved these conflicts and questions of credibility against appellant's contention and the trial court confirmed the jury's conclusion.

Petition for rehearing denied.